*465 On Petition for Rehearing
EDWIN L. JONES, Associate Judge.
On petition for rehearing it is suggested that this cause is one involving the powers and duties of the State Comptroller in the enforcement of Chapter 212, Florida Statutes, F.S.A., affecting the state revenue, and that an opinion in explanation of our previous judgment of affirmance would be of general interest to the public, bench, and bar.
The appeal was from a declaratory decree entered by the Honorable Hugh M. Taylor, Circuit Judge, as follows:
“Declaratory Decree
“By appropriate pleadings the Court is called upon to determine the liability for state sales taxes of sales of tangible personal property made to the plaintiff, Cen-tex Construction Co., Inc., hereinafter referred to as Centex, for incorporation into a housing project under construction at Eglin Air Force Base.
“In order to properly apply the statute it is necessary to describe in some detail a rather involved factual situation.
“The United States, acting through the Department of the Air Force, determined that it required extensive housing facilities as a part of Eglin Air Force Base. Plans and specifications were prepared and bids received. Centex was the successful bidder at a figure in excess of six million dollars.
“Pursuant to authority of an Act of the Congress this construction is being financed in the following manner:
“Acting under directions of the United States, Centex caused to be organized two Delaware corporations, Eglin AFB Housing, Inc., and Eglin AFB Blousing No. Two, Inc., which will hereinafter be referred to as the AFB corporations. These corporations have identical charters in a form dictated by the United States. Each has exactly one thousand dollars capital, is authorized to negotiate with the Federal Housing Authority to secure insurance upon a mortgage to finance a housing project, and until the mortgage debt is repaid it may issue no additional stock, borrow no other money, declare no dividends, and engage in no other business. Its books must be kept open to inspection by the Federal Housing Commissioner and the Secretary of the Air Force. Copies of minutes of all stockholders’ and directors’ meetings must be filed with the Secretary of the Air Force.
“The Federal Housing Authority issued to each of the AFB corporations a commitment to insure a mortgage covering approximately half of the proposed cost of the desired construction. Patently the interest of the government in the proposed construction is the only justification for such commitments.
“The United States agreed in writing to pay all sums becoming due upon the mortgages to be executed by the AFB corporations upon the project.
“With FHA insurance and a promise of the United States to pay the debt the AFB corporations of course found no difficulty in arranging to borrow from private sources sufficient funds for the construction.
“The United States executed two leases, one to each of the AFB corporations, ostensibly leasing the lands necessary for the housing project for a period of fifty-five years, but each of these leases contains the very novel provision that as each housing unit constructed upon the leased premises shall become available for occupancy it shall be placed under the control of the lessor, the United States. The price paid for each of these leases was one thousand dollars cash for the full term of the lease. Thus the entire capital of AFB corporation was immediately exhausted.
“The United States, Centex, and the AFB corporations entered into a contract for the construction by Centex of the proj *466 ect, partly upon the land leased to each of the AFB corporations. This contract conformed to the bid made by Centex to the United States, provided that all construction should be under supervision of the United States and in conformity with the plans and specifications furnished by the United States. Payments to Centex as the work progresses and upon completion are to be made by the AFB corporations upon certificates of representatives of the United States from money borrowed as above outlined. It is expressly provided that as progress payments are made title to the materials and work covered thereby shall vest in the United States, and Centex waives the right to claim any lien upon the project.
“Centex was required to give a performance and completion bond to guarantee performance of the contract on its part.
“Immediately upon the execution of this contract, and pursuant to previous commitment, Centex caused all of the stock of each of the AFB corporations to be endorsed in blank and together with resignations of all the officers and directors of these corporations to be placed in irrevocable escrow to be delivered to the United States immediately upon the completion of the project and the final issuance of FHA insurance upon the mortgages.
“The United States, in addition to a formal agreement to pay all sums becoming due upon the mortgages, also agreed to pay all local taxes levied upon the project, but accompanied this agreement by a statement that it denied that the property was subject to such taxes and reserved the right to contest their validity.
“Under these arrangements work on the project is now under way.
“To this state of facts we must apply the statute which provides that
“ ‘There shall also be exempted all sales made to United States Government, the state or any county, municipality or political subdivision of this state and including sales of tangible personal property made to contractors employed by any such government or political subdivision thereof where such tangible personal property goes into and becomes a part of public works owned by such government or political subdivision thereof.’ Florida Statutes 212.08 (3) [F.S.A.].
“That Centex is a contractor employed by the United States is quite obvious. The United States advertised for bids for the work to be done. It accepted Centex’s bid. It signed the contract with Centex and it is in process of supervising the construction. It arranged the method by which Centex will be paid and it is obligated to eventually pay the cost of construction by paying off the mortgages.
“It would seem to be equally obvious that the materials purchased by Cen-tex and used in the construction go into and become a part of the public works owned by the United States. Under the contract the United States must approve all materials as construction progresses, title to every item included in estimates for progress payments vests in the United States upon payment of the estimate, and title to the entire project vests in the United States upon the making of the final payment. Complete control of each housing unit passes to the United States upon its completion. The United States owns the fee. It will have control and the beneficial use of each housing unit from the time it is ready for occupancy throughout its useful life. The project as a whole is a part of the system of national defense essential to the continued existence of the nation.
“The AFB corporations were created at the direction of the United States for the sole purpose of borrowing money to be expended in constructing facilities needed by the United States, to be repaid by the United States and further securing the payment of this money by a mortgage upon property of the United States. These corporations will continue in existence until the mortgage debts are paid, so as to *467 provide a party against whom the mortgages may be foreclosed in the remote contingency that the United States defaults in its obligation to pay the mortgage debt.
“Even if we regard the AFB corporation as private enterprises, their interest in the property is so negligible — lessees without right of use or possession— as to make it entirely unrealistic to hold that it destroys the status of these buildings as a part of the public works of the United States.
“It is very doubtful if these corporations should be regarded as anything other than agencies or instrumentalities of the Federal Government. In Clallam County, Wash. v. United States [263] U.S. [341], [44 S.Ct. 121], 68 L.Ed. 328, the Supreme Court held that a corporation created for the purpose of operating a sawmill and railroad in the promotion of the war effort during the first World War and which was wholly owned by the United States was an agency of the United States and that its property was, therefore, immune from state taxation. In describing the corporation there involved the [sic] used language peculiarly applicable to each AFB corporation: ‘The incorporation and formal erection of a new personality was only for the convenience of the United States, to carry out its ends.’ The creation of the AFB corporations was only for the convenience of the United States to enable it to finance military construction in a manner determined by the Congress to be most conducive to the national interest.
“The Attorney General, representing the Comptroller, argues that ‘The exemption under the statute was intended to go no further than announced in [State of] Alabama v. King & Boozer’ (314 U.S. 1 [62 S.Ct. 43], 86 L.Ed. 3). With this argument the Court cannot agree. The King & Boozer case dealt with the validity of a tax under a statute which was quite different from ours, and the question there presented and decided was whether a sale to a contractor with the United States was immune from the state taxation by virtue of the Constitution of the United States. The Court held that the immunity of the United States from state taxation did not prevent state taxation of sales to contractors with the United States although the ultimate burden of the tax would be borne by the national treasury. The question here is the extent of an exemption granted by state statute. Had the legislature intended to limit the exemption to that required by the Federal Constitution there would have been no occasion whatever to go further than to say ‘There shall also be exempted all sales made to the United States.’ But the legislature intended to grant a greater exemption and made that intent clear by adding ‘including sales of tangible personal property made to contractors employed by any such government or political subdivision thereof where such tangible personal property goes into and becomes a part of public works owned by such government * * *.’ (Emphasis supplied.) This language must be given its clear meaning. It is as much the duty of the court to recognize and give effect to exemptions from taxes as it is to enforce the payment of taxes on those transactions not exempted. The legislature has seen fit to favor the state’s political subdivisions and the Federal Government by excluding them from the impact of the taxing statute under factual situations to which the tax could have been made applicable without violating any constitutional immunities, but in which the burden of the tax could be expected to be passed on to the Government or governmental agency. The wisdom of this policy-is a matter for legislative consideration. The courts are not authorized to restrict the exemption granted by the statute.
“As exemption in a taxing statute should be strictly construed but,
“ ‘The strict construction of the exemption section should not force the conclusion that the legislature intended other *468 than that which it expressed in plain language, if the exemption as expressed in plain language is reasonable.’ American Bridge Co. v. Smith [352] Mo. [616], 179 S.W.2d 12, 157 A.L.R. 798.
“Some reliance is placed by the Comptroller upon the case of Boeing Airplane Co. v. Commission of Revenue & Taxation [153] Kan. [712], 113 P.2d 110. That case involved a statute quite similar to ours but a factual situation entirely different from that before the Court. Boeing was engaged in performing, for profit, contracts with the United States and needed additional facilities. The United States advanced money over a period of five years after which title to the property vested in it subject to an option remaining in Boeing. Sales of material going into this construction were held to be taxable. In the Boeing case the underlying purpose of the transaction was for the United States to finance Boeing in order to assist it in performing contracts for its profit. In the case at bar the underlying purposes of the transaction is for the United States to secure the assistance of private capital in financing essential public works of the United States, without increasing the admitted public debt.
“The Comptroller also relies upon Gay v. Jemison, Fla., 52 So.2d 137, which was a case in which the Supreme Court of Florida held that the sales of materials going into construction of a housing project erected at Tyndall Field were not within the exclusion of Section 212.08(3). The housing project there involved was intended primarily for the use of military personnel, was on property leased by the United States to a private corporation and the United States held legal title to the buildings and exercised a degree of supervision over the operations of the private corporation. But there the similarity between that case and this ends. The plan under which the project under consideration in the Jemison case was constructed and operated was developed under the then existing Federal statute. That statute has been materially changed. A detailed comparison of the practical operation of the former statute and that presently involved might lead to the conclusion that the present plan of operation was designed to bring the present method of securing the construction of such projects out from under the decision in the Jemison case.
“In the Jemison case a private corporation, operating for profit, leased land from the United States paying an annual rental, constructed the project on these lands, and rented the various housing units to military personnel assigned to it by the military authorities, collected rents from these tenants, maintained insurance upon the buildings, kept them in repair, paid taxes on the property, and, while yielding a degree of supervision of its operations to the United States, was responsible for the financial success of its business, could rent to civilians units not needed by the military, borrowed the money it needed to build the project, paid the mortgage maturities from its own funds, and anticipated a profit from this operation. The lease was for seventy-five years (at least equalling the useful life of the building) during which this business could continue in operation for the profit of the stockholders of the corporation.
“In the case at bar the AFB corporations cannot operate at a profit. They own leases on property of the United States but the beneficial use of the property must, under the contracts, and the Federal Statutes, remain in the United States. The corporations are not permitted to rent the housing units. The United States does that. They are not permitted to collect any rent. If any rent is collected the United States collects it. Insurance during construction is carried by the contractor. After the completion of construction the corporations are under no obligation to maintain the buildings or keep them insured. The corporations can in no possible way make a profit. They can engage in no other business, can issue no other stock, can borrow no additional money. They cannot occupy the leased premises. From the completion of the construction, the *469 United States is the sole owner of all stock of the corporations and is obligated to pay the mortgage debt and all taxes levied upon the property. Apparently it is contemplated that the United States will charge rent to those to whom it assigns the housing units and from the rent so collected insure and maintain the buidings and discharge the mortgage debt, and benefit by any incidental profit, but this is entirely •optional with the United States. The quarters may be assigned to military personnel without charging rent and the mortgage may be paid off from congressional appropriations. Should, in some manner now unforeseeable, either of the AFB corporations make a profit, that profit would belong to the United States as the sole owner ■of the corporation.
“It is true that during the period of con,-struction of the AFB corporations have a technical right of possession of the prem•ises but that is purely theoretical posses■sion. The actual occupancy of the premises must be by the contractor who is op-erating under supervision of Federal authorities. During this period also the technical legal title to the stock remains •in private hands but the stock is held in . escrow to be delivered to the United States upon the happening of a contingency — the . completion of the construction — and the oc- . currence of that contingency is guaranteed by a construction and completion bond exe- . cuted by a surety which is approved by the United States.
“The purchaser of the materials, the sales . of which are sought to be taxed, is Centex. ■ Centex made a bid to and contracted with the United States. All that Centex can ever get out of the transaction is the profit, • or loss, on the construction work. The ■ creation of, the limited activities of, and •the ultimate destiny of the AFB corporations are the mechanics by which the United States arranged to pay Centex the contract price of designated public works.
“To summarize the whole picture: — Im,.mediately before the construction began the United States owned bare land upon which it desired to have certain improvements, and a bid from Centex to construct those improvements at a price agreeable to the United States. When construction is completed the United States will have title to and possession of these lands with the improvements and be obligated to pay off the mortgage from the proceeds of which the improvements were constructed. There will be in existence a technical, but wholly inactive, lease to a corporation completely owned by the United States. No right of use, occupancy or possession can arise under this lease unless the United States defaults in its obligation to pay the mortgage debt and the mortgage is foreclosed, an eventuality too remote to be given any substantial weight.
“The court is of the opinion that the sales of materials actually going into and becoming a part of these improvements are exempted from the sales tax by the letter and spirit of the quoted part of the statute.
“Of course, this exemption is limited to those materials actually physically incorporated in the buildings and does not apply to purchases of gasoline, tools and other supplies which will form no part of the completed structures even though they may be consumed in the process of construction.
“It is therefore,
“Considered, ordered, adjudged, decreed and declared:
“That sales of tangible personal property to Centex Construction Co., Inc., a Delaware corporation, which materials go into and become a part of the construction contemplated by FHA Project No. 063-81002-Air 1 and FHA Project No. 063-.81003-Air 2, are exempt from the operation of the sales tax imposed by Chapter 212, Florida Statutes, F.S.A.
“It is the duty of Ray E. Green, as Comptroller of the State of Florida, upon proper *470 application made as provided by law, to refund any tax heretofore collected upon any such sales and to refrain from requiring payment of any further taxes upon any such sales.
“Jurisdiction is retained for the purpose of entertaining an application for further relief should the occasion therefor arise.”
The foregoing decree clearly states the facts and correctly answers the controlling questions presented to the learned circuit judge.
We therefore adhere to our former judgment.
STURGIS, C. J., and CARROLL, DONALD K., J., concur.